***********
The Full Commission grants Plaintiffs motion to submit medical records in order to make the record complete. Having received a complete set of the medical records that were stipulated to in the pre-trial agreement, this matter is now ready for a decision.
 ***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman, the briefs, oral arguments before the Full Commission, and the medical records submitted following the Full Commission hearing. The appealing party has not shown good ground to reconsider the evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Morgan S. Chapman.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant.
3. Gold Kist Inc. was at all relevant times self-insured for claims under the North Carolina Workers' Compensation Act with Carson Brooks, Inc. as its servicing agent.
4. The employee sustained an injury (or started missing time from work because of disease) on or about December 2, 1999, the exact date to be determined by the Industrial Commission. In addition, the parties stipulated into evidence a copy of Lieutenant McIver's report with attached documentation. The Pre-Trial Agreement submitted by the parties is incorporated by reference. In addition, subsequent to the hearing, a Form 22 wage chart along with further wage and employment information was submitted by defendants. These documents were received into evidence.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was 36 years old as of the date of hearing and a high school graduate, initially began working for defendant in the early 1990s, but left after four to five years to go to work for another employer. In August 1999, he quit his job with the other employer and returned to work for defendant as a live catcher. His job involved going into chicken houses, catching the chickens and then placing them into large cages which were subsequently put on a flatbed tractor-trailer by forklift. The live catchers on his crew would grab seven to eight chickens by the legs before taking them to the cage. Each live catcher worked with a partner who was also catching the birds. Another employee would use wire fencing to herd the chickens together so that the catchers could grab them more easily. The workers tried to get the job done as quickly as possible so that they could leave.
2. The live catchers were paid according to the number of chickens caught. It appeared from the wage and employment records submitted after the hearing that the dates of employment shown on the Form 22 wage chart were not accurate. Plaintiff started working on approximately August 23, 1999. As of December 2, 1999, his average weekly wage was $672.38.
3. The crew plaintiff worked on was a rough group. It was normal for the employees to verbally abuse each other throughout the time at work. Besides ordering each other to pick up the pace or get out of the way, they picked on each other regarding their appearance, their girl friends, and multiple other subjects. There was also considerable bragging about how badly one worker could beat up another. Although the conversation was harsh and profane, most of the workers, including plaintiff and the supervisor, considered it to be "joking around." However, Opey and Jason Warren, who were brothers working on the same crew, did not appreciate the ridicule. Opey was smaller than the others and was frequently picked on about his size.
4. On December 2, 1999, plaintiff's crew was assigned to capture and load the chickens at Roger Brown's farm. There were 47,000 to 48,000 chickens on the farm. Plaintiff and Opey Warren worked closely enough that day so that Opey was one of the subjects of ridicule for plaintiff as he caught chickens. Plaintiff called him "bony" and "skinny," and told him that he should stop working out because it was not helping him any and made comments about how badly plaintiff could beat him up. Plaintiff also told him to speed up because he was working too slowly. Opey ultimately became so frustrated that he threatened to stop working and start watching plaintiff catch the chickens. However, at about that time, the last of the chickens were caught and caged.
5. The crew then left the chicken house and walked to their van while the supervisor filled out the trucker's paperwork. Plaintiff and Opey continued arguing and, when they got to the van, plaintiff pushed Opey. They then started wrestling with each other. Opey's brother Jason was nearby but was behind plaintiff, who did not see him pull out a knife. Jason then began to stab plaintiff around his upper back and shoulders. Plaintiff did not realize he was being stabbed at first and thought that Jason was just hitting him until his leg went out from under him. He then looked down and saw blood. At this point plaintiff tried to run away, but Jason followed him and stabbed him further. Jason stopped when he saw another worker reaching into the trunk of a car. Thinking that the coworker might have a gun, he and Opey ran to their car and drove away as quickly as they could.
6. Someone called for an ambulance. Once the ambulance arrived and plaintiff s condition was assessed, the ambulance personnel summoned a medical helicopter which took him to Memorial Hospital in Chapel Hill.
7. Plaintiffs medical records were not placed into evidence so the specifics regarding the nature of his injuries and his medical treatment were not disclosed by the evidence. However, he apparently underwent surgery upon admission to the hospital, was placed in the intensive care unit for a period of time and was discharged from the hospital after about eight days. He then had to have home health care for an unknown period. His medical bills were initially paid, but liability was subsequently denied so he had difficulty obtaining further medical treatment.
8. Defendant has denied this claim on the basis that the verbal harassment which led to the incident was not significantly related to the subject of the work duties. However, verbal abuse and harassment were a routine part of the work environment for all of the employees. The supervisor, who was present and who helped in the catching process, did nothing to stop or even criticize the practice. He considered it to be joking around and apparently would have only intervened if there had been what he considered to be hostile behavior or a physical fight. In his opinion this was a good crew. He had never felt the need to confront any of the employees about their behavior.
9. Plaintiff had no contact with the Warren brothers outside of work. The incident of December 2, 1999 arose solely from problems which had developed between them during the course of their employment together. Plaintiff did not understand that the Warren brothers considered the verbal exchange to be highly offensive, while the Warren brothers could not understand why the supervisor had failed to intervene before the situation "got out of hand."
10. On December 2, 1999, plaintiff sustained an injury by accident arising out of and in the course of his employment. He was still at the work site and needed to change clothes before the supervisor would drive him back to the office in the company van. The assault by Jason Warren was unintended and unexpected on plaintiffs part. Plaintiff was engaged in horseplay at the time with Jason's brother, but was not intending to injure anyone. He considered the wrestling to be a friendly scuffle. Although the Warren brothers saw nothing friendly about the encounter, Jason's response to the situation was grossly excessive. In any event, the conflict which lead to the stabbing arose from the work environment. Plaintiff certainly contributed his share of the daily verbal harassment but so did the others on the ten-man crew, and every employee was subject to it. The supervisor considered the verbal exchange a form of entertainment or distraction for those doing the mundane and dirty job of catching chickens and he expected it to occur. However, the criticism and ridicule bothered Opey and Jason Warren and they became increasingly upset about the situation. The comments that plaintiff and others at the work site made on December 2 further inflamed their frustration. The comments were partly related to work, particularly the pace of work. In addition, however, the harassment had become part of the regular work routine due to the supervisor's attitude and expectation. Consequently, there was a causal connection between the injury and the employment.
11. As a result of his injury by accident, plaintiff was unable to work in any capacity from December 3, 1999 until an unknown date in October 2000 when he returned to work for defendant in a light-duty capacity as a wire puller. In this job, he moved fencing down the length of the chicken house to corral the chickens so that they would be easier to catch. He was also responsible for catching strays which managed to get around the fence. As the weather became colder, he had increasing difficulty performing the job due to ongoing problems associated with his injury. By December 2000 it was clear to him and his supervisor that he could not keep up with the required pace. Consequently, he stopped working.
12. While working as a wire puller, plaintiff earned lower wages than those he had been earning before his injury, but the evidence was insufficient to determine the exact amount earned. There was also insufficient evidence presented to determine the period of his temporary total disability beginning in December 2000. However, since he apparently had some difficulty getting medical treatment without insurance coverage, further medical evaluations may be necessary before a complete determination can be made about his disability.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 2, 1999, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6); Withers v. Black,230 N.C. 428 (1949).
2. Plaintiff is entitled to compensation for temporary total disability at the rate of $448.26 per week from December 3, 1999 until he returned to work in October 2000. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to compensation for temporary partial disability at the rate of two thirds of the difference between his former average weekly wage of $672.38 and the weekly wages he earned from the date in October 2000 when he returned to work until the date in December 2000 when he stopped working. N.C. Gen. Stat. § 97-30.
4. Although plaintiff is entitled to further compensation for temporary total disability beginning in December 2000, he did not prove the period during which he would be entitled to that compensation. N.C. Gen. Stat. § 97-29; Hilliard v. Apex Cabinet Company, 305 N.C. 593 (1982).
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $448.26 per week from December 3, 1999 until he returned to work in October 2000. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendant shall pay compensation to plaintiff for temporary partial disability at the rate of two-thirds of the difference between his former average weekly wage of $672.38 and his weekly earnings from the date he returned to work in October 2000 until the date he stopped working in December 2000. This compensation has also accrued and shall be paid in a lump sum subject to the attorney's fee approved.
3. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Mr. King.
5. Defendant shall pay the costs.
IT IS FURTHERMORE ORDERED:
1. The parties may resolve the remaining issues by agreement or they may either request a new hearing to submit additional evidence by stipulation and/or deposition for further findings regarding the extent of disability compensation due plaintiff.
This 28th day of August
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/__________________ BERNADINE S. BALANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN